```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
THE UPPER DECK COMPANY, LLC,

                Plaintiff,
                                           03 Civ. 8978 (MGC)
        -against-
                                                OPINION
BREAKEY INTERNATIONAL, BV,

                Defendant.
-----------------------------------X
BREAKEY INTERNATIONAL, BV,

    Counterclaim Plaintiff,

        -against-

THE UPPER DECK COMPANY, LLC,

    Counterclaim Defendant.
-----------------------------------X

APPEARANCES:

                O'Melveny & Myers LLP
                Attorneys for Plaintiff-Counterclaim Defendant
                The Upper Deck Company, LLC
                7 Times Square
                New York, NY 10036

                By:  Dale M. Cendali, Esq.
                     Daniel L. Cantor, Esq.
                     Claudia E. Ray, Esq.

                Paul, Weiss, Rifkind, Wharton & Garrison LLP
                Attorneys for Defendant-Counterclaim Plaintiff
                BreaKey International, BV
                1285 Avenue of the Americas
                New York, NY 10019-6064

                By:  Mark H. Alcott, Esq.
                     Eric Twiste, Esq.
                     Nili T. Moghaddam, Esq.
                     Jason K. Sonoda, Esq.
```

**CEDARBAUM, J.**

The Upper Deck Company, LLC ("Upper Deck") has moved for partial summary judgment dismissing the counterclaims of BreaKey International, BV ("BreaKey") for lost royalties, unspent advertising dollars, and punitive damages for breach of contract. At oral argument on February 2, 2005, summary judgment was granted to Upper Deck dismissing BreaKey's counterclaim for punitive damages. For the reasons that follow, the balance of Upper Deck's motion is granted in part and denied in part.

BACKGROUND

This opinion assumes familiarity with the earlier summary judgment opinion in this case, Upper Deck Co. v. BreaKey Int'l, BV, No. 03 Civ. 8978 (MGC), 2004 WL 2980190 (S.D.N.Y. Dec. 22, 2004).

BreaKey is a small Dutch company that developed a toy made of small plastic keys and a related online game called "BreaKey." In a contract dated "[a]s of November 15, 2002," (the "Agreement"), BreaKey granted Upper Deck an exclusive two-year license "to use, copy, promote, distribute, market and sell" the BreaKey product worldwide, excluding Brazil, Venezuela, and the Benelux countries (Belgium, the Netherlands, and Luxembourg). In exchange for these rights, Upper Deck agreed, among other things, (i) to launch the product in reasonable commercial quantities in the United States, the European Union, and Japan (the "Material

Territories") by May 2003 and in all other territories by November 2003, (ii) to spend a minimum of $1 million on marketing and advertising during each of the two years of the Agreement in each of the three Material Territories (for a total of $6 million), and (iii) to pay BreaKey royalties equal to ten percent of "Net Sales."  The Agreement further required Upper Deck to pay BreaKey a $2.5 million "nonreturnable Minimum Guarantee" at the commencement of each contract year as an advance on royalties to be earned during that year.

Upper Deck sued to rescind the Agreement on November 13, 2003, two days before its obligation to pay the second $2.5 million minimum guarantee came due.  BreaKey counterclaimed for breach of contract.  On October 13, 2004, BreaKey moved for partial summary judgment dismissing the claims in Upper Deck's Third Amended Complaint and granting certain of its own counterclaims.  At oral argument on BreaKey's motion, I held that Upper Deck had breached the Agreement by failing to make the second $2.5 million minimum guarantee payment.  Summary judgment was granted to BreaKey on that portion of its counterclaim, and judgment will be entered pursuant to Fed. R. Civ. P. 54(b).  I also held that there is a genuine issue of disputed fact as to whether Upper Deck's alleged failure to spend the marketing and advertising minimums provided for under the Agreement was a breach of contract, and that even if such a failure did

constitute a breach, there is no evidence that it caused BreaKey to suffer loss on a dollar-for-dollar basis.

Upper Deck now moves for partial summary judgment dismissing certain damages BreaKey seeks in connection with its breach of contract counterclaim. Specifically, Upper Deck moves to dismiss BreaKey's claims for lost royalties in the second year of the Agreement, lost royalties under a hypothetical future two-year license agreement, and the unspent portion of the $6 million Upper Deck was required under the Agreement to spend on marketing and advertising.

## DISCUSSION

A. <u>Summary Judgment Standard</u>

A motion for summary judgment shall be granted if the court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In deciding whether a genuine issue exists, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." <u>In re Chateaugay Corp.</u>, 10 F.3d 944, 957 (2d Cir. 1993).

The test for granting summary judgment is similar to the standard for a directed verdict. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-52 (1986). If the evidence is such that

4

a reasonable finder of fact could return a verdict for the nonmoving party, then there is a genuine factual dispute and summary judgment should not be granted. Id.; Richardson v. Coughlin, 763 F. Supp. 1228, 1234 (S.D.N.Y. 1991). However, if after discovery the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to one of the claims, and on which that party will bear the burden of proof at trial, summary judgment should be granted on that claim. Celotex, 477 U.S. at 322-23; Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309 (2d Cir. 1994). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23.

B.  BreaKey's Claim for Lost Royalties

Under New York law, a claimant may recover lost profits for breach of contract if it can demonstrate that such damages were caused by the breach, that the alleged loss is capable of proof with reasonable certainty, and that the damages were within the contemplation of the parties at the time the contract was made. Kenford Co., Inc. v. County of Erie, 67 N.Y.2d 257, 261 (1986); Galloping, Inc. v. QVC, Inc., 27 F. Supp.2d 466, 468 (S.D.N.Y. 1998). Both the existence and the amount of lost profits damages must be established with reasonable certainty, and although such damages "need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (quoting Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403 (1993)).

In this case, the Agreement between Upper Deck and BreaKey specifically provided for the payment of profits in the form of royalties to BreaKey. The Agreement also assured BreaKey $2.5

million in royalties each year, regardless of Upper Deck's sales performance.  Therefore, in order to establish the existence of damages and defeat summary judgment, BreaKey must come forward with evidence sufficient to demonstrate with reasonable certainty that Upper Deck would have generated sales in excess of $25 million annually during the term of the Agreement.

   1.   <u>Lost Royalties In the Second Year of the Agreement</u>

   BreaKey seeks to recover royalties it claims it would have earned in the second year of the Agreement had Upper Deck fully performed its obligations.  In support of this claim, BreaKey submits the report of Marion B. Stewart, an economist who has for the past seventeen years been employed by a company that provides economists as witnesses in lawsuits.  Stewart opines in his report that "[a]s a result of failing to launch the product on the agreed-upon schedule and not expending the contractual minimum advertising and marketing costs, Upper Deck caused BreaKey to lose royalty revenues" in the amount of $9.4 million in the second year of the Agreement.  This would entitle BreaKey to $6.9 million beyond the $2.5 million minimum guarantee.

   Stewart relies for this opinion on an October 2003 invoice reflecting a sale of 15,000 boxes of the BreaKey product to Studio 100, then BreaKey's exclusive licensee in the Benelux countries.  Stewart states that "[a]ccording to BreaKey," Studio 100 resold the boxes in Belgium during the period from December 2003 through May 2004.  BreaKey concedes that Studio 100 terminated its agreement with BreaKey in early June 2004, and that there were no further sales in Belgium.  Nevertheless, Stewart doubles the 15,000 boxes to reach a hypothetical sales figure of 30,000 boxes a year.  "[S]caling the 30,000 figure up" to an assumed target population of children ages six to twelve years old in the Material Territories, Stewart multiplies that number by an average wholesale price of $32 per box -- a price he assumes based on "a number of sources that indicate actual or projected wholesale revenues in the range of $29 to $54 per box."  The "sources" Stewart identifies are a 2002 "forecast" of sales by Diset, a Spanish distributor with whom BreaKey never contracted, a "discussion with Rob Sluijs" about BreaKey's revenues in the Netherlands, and three Upper Deck documents, submitted by BreaKey after oral argument, labeled "Q1 Projections," "Draft" "Preliminary Profit & Loss Account for 3 months from Launch Date – German launch," and "Draft" "Projected Income Statement - BreaKey."  After accounting for "the timing of the revenues," Stewart ultimately concludes that "lost royalties to BreaKey total at least $8.0 million [in the Material Territories] during the second year of the contract."

6

Stewart applies the same analysis to thirteen additional countries he identified with "per-capita income levels and rates of Internet use at least as high as those at the lower end of the list in the Material Territories," and opines that sales into these other territories would have resulted in an additional $1.4 million in lost royalties to BreaKey in the second year of the Agreement.

At oral argument and again by order dated March 1, 2005, I directed BreaKey to identify from among the documents it submitted in opposition to Upper Deck's motion for partial summary judgment the admissible evidence showing the basis for its assertion that sales by Studio 100 in Belgium took place over a six-month period. It could not. Instead, it proffered new evidence in the form of a declaration by Rob Sluijs, BreaKey's managing director. Sluijs states that he "believe[s]" Studio 100 sold all 15,000 boxes of the BreaKey product in Belgium between December 2003 and early June 2004 because (i) BreaKey's manufacturer in China delivered the boxes to Studio 100 in December 2003, (ii) Studio 100 stopped selling the product in early June 2004 when it cancelled the license agreement, and (iii) Studio 100 did not exercise its right under the license agreement to return a percentage of unsold products to BreaKey.

According to Sluijs, his belief that Studio 100 sold all 15,000 boxes in six months is "further corroborated" by Studio 100's report to BreaKey at an April 2003 meeting that it had already sold seventy percent of the inventory after three months of retail sales in Belgium. Sluijs also states that Studio 100 "informed us that [it] believe[s] all of the [15,000] boxes were sold, but [it] cannot be certain because the keys were sold in a joint venture with Het Laatste Nieuws." Sluijs's report of what a third party, Studio 100, "informed" him is inadmissible hearsay and cannot be considered on a motion for summary judgment. Rubens v. Mason, 387 F.3d 183, 189 (2d Cir. 2004); Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004). BreaKey has offered no testimony from Studio 100 to establish its actual sales experience in Belgium.

In his original and supplemental reports, Stewart points to other data that he contends support estimates of sales in excess of $25 million per year. These are: (i) a comment by Upper Deck's CEO Richard McWilliam to Sluijs over dinner on November 21, 2002 that the product would generate $120 to $180 million in worldwide sales each year, (ii) a June 2003 internal Upper Deck document titled "Brand Strategy" for the United States, which notes a "[w]orldwide [l]aunch" of September 15, 2003 and lists among "[b]rand [o]bjectives" "[g]enerat[ing] $50MM in revenue by December 31, 2004," (iii) BreaKey's own sales in the Netherlands during twelve weeks between April 2002 and July 2002, (iv)

7

Diset's 2002 "forecast," (v) sales by Upper Deck in the United States during the four months from December 2003 through March 2004, and (vi) sales by Upper Deck in Germany from October through December 2003.

Stewart's damages calculations are based on too many unsupportable assumptions to establish the existence of lost royalties with the reasonable certainty required. While Upper Deck may be, as BreaKey argues, "an experienced player in the collectible toy market," this is a new entertainment product that has never before been sold in thirty-five of the thirty- seven countries for which Stewart projects sales. See Schonfeld, 218 F.3d at 172 (noting that "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate" of lost profits). The data on which Stewart relies provide an insufficient historical record upon which to project future earnings. See Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 333 (2d Cir. 1993) (holding plaintiff could not extrapolate seven years of lost profits from four months of sales of new product); Int'l Telecom, Inc. v. Generadora Electrica Del Oriente, No. 00 Civ. 8695 (WHP), 2004 WL 784941, at *4 (S.D.N.Y. Apr. 13, 2004) (denying lost profits where plaintiff "[sought] to project eight years of lost profits based on only two months revenues in a new business venture"). BreaKey's reliance on Galloping, Inc. v. QVC, Inc., 27 F. Supp.2d 466 (S.D.N.Y. 1998), is misplaced. In that case, plaintiff presented evidence of sales over a two-and-a-half-year period in the relevant market. Id. at 468; see also Care Travel Co. v. Pan Am. World Airways, Inc., 944 F.2d 983, 994 (2d Cir. 1991) (evidence of actual sales over nearly three-year period in the relevant market).[1]

---

[1] BreaKey also relies on internal Upper Deck manufacturing schedules and "projections" to support its lost royalties claim. However, the cases it cites for the proposition that a defendant's own projections may support an award of lost profits are unavailing because the projections in those cases were accompanied by and based on a more robust record of sales within the relevant market. See Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1037, 1038 (2d Cir. 1992) (considering documents provided by franchisor to franchisee showing both projected and actual sales of Sir Speedy franchisees); S&K Sales Co. v. Nike, Inc., 816 F.2d 843, 852 (2d Cir. 1987) (holding jury could have calculated plaintiff's profits based on undisputed evidence of full year of sales, and on projection which defendant itself found sufficiently credible to cause it to terminate its agreement with plaintiff and establish its own military sales representative).

Nor is there any basis in the record for Stewart's assumption that short periods of sale in Belgium, the Netherlands, the United States and Germany can be extended over longer periods and repeated in countries as varied as Estonia, Portugal and Japan. See David v. Glemby Co., 717 F. Supp. 162, 169 (S.D.N.Y. 1989) (holding that plaintiff's successful franchise business in Europe could not be the basis for establishing that he would have been equally successful in the United States). "Indeed, New York courts have been especially loath to award lost profits for entertainment ventures," because "[t]he heterogeneity of entertainment products, and the volatility of consumer preferences . . . increases the difficulty of predicting future hits and misses for even the most savvy of marketers and investors." Schonfeld v. Hilliard, 62 F. Supp.2d 1062, 1076 (S.D.N.Y. 1999) (collecting cases), aff'd in part and reversed on other grounds, 218 F.3d 164 (2d Cir. 2000).

2. Lost Royalties Beyond the Term of the Agreement

BreaKey also seeks to recover royalties it claims it would have earned under a future license agreement in the two years following expiration of the term of the Agreement on November 14, 2004. BreaKey claims these damages arise from its "inability to contract upon favorable terms with another licens[ee] . . . because of Upper Deck's wrongful conduct."

In calculating BreaKey's lost royalties for the two years beyond the term of the Agreement, Stewart "assum[es] that Upper Deck's actions have precluded BreaKey from entering another two-year contract on similar terms to the original Upper Deck/BreaKey contract (with Upper Deck or another licensee)." Based on that assumption and on the same analysis used to calculate lost royalties under the Agreement with Upper Deck, Stewart concludes that "additional lost royalties to BreaKey would total $19.6 million."

"[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case." Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F. Supp.2d 571, 579 (S.D.N.Y. 1999), aff'd, 257 F.3d 256 (2d Cir. 2001). There is no factual basis in the record to support Stewart's assumption that Upper Deck's conduct prevented BreaKey from entering into another contract on terms similar to the Agreement with Upper Deck. Rather than point to admissible evidence in the record that would defeat summary judgment, BreaKey, in its brief in opposition to Upper Deck's motion and again at oral argument, simply offered as a matter of logic that "no company will license a product if that product's patentability is being challenged, if that product has been dumped on the market and then withdrawn, if

9

a major former licensee of the product is defaming the product and the product's owners, and if they might thereby be dragged into litigation."

After oral argument, BreaKey attempted to proffer new evidence in the form of a declaration from a potential licensee with whom it had discussions in June 2004 following termination of the Agreement. Because BreaKey refused prior to this motion to provide Upper Deck with the names of potential licensees with whom it was negotiating, the declaration will not be considered here. BreaKey cannot shield itself from discovery and then use the same information it sought to withhold as a sword to defeat summary judgment.

Because BreaKey's claim for lost royalties under a hypothetical contract for November 2004 to November 2006 with terms identical to those in the Agreement with Upper Deck is speculative, the claim must be dismissed.

C. BreaKey's Claim for $6 Million in Unspent Advertising Dollars

Finally, BreaKey seeks to recover the unspent portion of the $6 million Upper Deck was required to spend on marketing and advertising over the two-year term of the Agreement. BreaKey argues that "a jury could find that BreaKey will have to spend the $6 million itself to market the product, and thus award that amount to BreaKey."

As previously noted, BreaKey's own motion for summary judgment on this claim was denied. The damages in a breach of contract action are generally measured by the non-breaching party's actual loss. See Restatement (Second) of Contracts § 347. Here, the actual loss to BreaKey was the value to the BreaKey brand that the advertising would have generated. That number is a disputed fact. Accordingly, it is inappropriate to preclude BreaKey on summary judgment from proving the amount of that actual loss.

CONCLUSION

For the foregoing reasons, Upper Deck's motion for partial summary judgment dismissing BreaKey's claims for lost royalties during and after the term of the Agreement is granted. Upper Deck's motion to dismiss BreaKey's claim for damages resulting from an alleged failure to spend the required advertising funds is denied.

SO ORDERED.

Dated:   New York, New York
         September 29, 2005

S/ _____
MIRIAM GOLDMAN CEDARBAUM
United States District Judge